IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ARMI B. SANCHEZ,

                   Plaintiff,                      No. 03:13-cv-00864-HZ

     v.

PURINA ANIMAL NUTRITION, LLC,           OPINION & ORDER
and LAND O'LAKES, INC., a Minnesota
corporation,

                Defendants.

Elizabeth Farrell Oberlin
Attorney at Law
0324 Abernethy Street
Portland, Oregon 97239

        Attorney for Plaintiff

Amy Joseph Pedersen
Ryan S. Gibson
STOEL RIVES LLP
900 S.W. Fifth Avenue, Suite 2600
Portland, Oregon 97204

        Attorneys for Defendant

1 - OPINION & ORDER

HERNANDEZ, District Judge:

Plaintiff Armi Sanchez brings this employment discrimination action against her former employer Land O'Lakes, Inc.[1]  Defendant moves for summary judgment.  Because Plaintiff cannot establish a prima facie case of retaliation, or alternatively, cannot establish pretext, Defendant's motion is granted.[2]

BACKGROUND

Plaintiff was hired as a Customer Service Representative (CSR) for Defendant in November 2010.  She was terminated on October 30, 2012 after having been placed on a Performance Improvement Plan (PIP) on August 29, 2012.

Plaintiff was hired by Kay Loehr who supervised Plaintiff during the entire time she worked for Defendant.  According to Loehr, Plaintiff had performance problems from the beginning of her employment and despite extra training and instruction, and despite Loehr adjusting Plaintiff's responsibilities until she improved enough to resume her full duties as a CSR, Plaintiff continued to experience problems.  Loehr Decl. at ¶¶ 9-33.  Loehr explains that Plaintiff struggled to learn about Defendant's products, to process orders correctly, to work efficiently enough to not fall behind, and to communicate effectively with CSRs, other co-workers, and customers.  Id. at ¶¶ 9-11.  Despite being instructed to ask questions of her

---

[1]  Defendant Purina Animal Nutrition, LLC was dismissed by stipulation on July 31, 2013 [ECF 8].

[2]  Plaintiff originally brought claims of hostile environment racial harassment and disparate treatment race discrimination as well as claims of retaliation.  First Am. Compl. at ¶¶ 19-57.  In response to Defendant's motion, Plaintiff concedes that her hostile environment and disparate treatment claims are insufficient to survive summary judgment.  Pl.'s Resp. at 2 n.2.  Thus, I grant summary judgment to Defendant on those claims and analyze the motion only as to the retaliation claims.

immediate co-workers within her own department before seeking assistance from employees in other departments, Plaintiff continued to direct questions to those outside the department first. Id. at ¶¶ 12, 22.  Loehr explained that addressing issues within the customer service department first was important to maintain the reputation of the department and instill confidence in the company that customer service would handle orders efficiently and accurately.  Id. at ¶ 12.

Loehr cites to several examples of Plaintiff's poor customer service and communication skills.  E.g., Id. at ¶¶ 14, 21, 33; Exs. 5, 11, 12, 23, 33, 34 to Loehr Decl.  She also cites to several examples of Plaintiff's continuing problems with her job duties of billing and processing of credits.  E.g., Id. at ¶¶ 9, 17, 20, 23, 24, 33; Exs. 9, 10, 14, 15, 24, 25, 26, 29, 31, 32 to Loehr Decl.

In March 2011, several months after Plaintiff began working for Defendant, Loehr relieved Plaintiff of the duty of receiving customer orders directly by telephone or email in response to the numerous complaints she received about Plaintiff.  Id. at ¶ 15.  Loehr's intent was to temporarily take away Plaintiff's direct customer interaction until Plaintiff improved and demonstrated she could effectively interact with customers and take their orders.  Id.  Loehr assigned Plaintiff to focus her time processing billing and credits placed by other CSRs.  Id.  This required less direct contact with customers, but still required some.  Id.  The change was intended to be a short-term adjustment, not a permanent reassignment.  Id.  The goal was to have Plaintiff "back on the phones" and handling "calls with confidence" in a month.  Id.  Unfortunately, Plaintiff never returned to taking customer orders on the phone during her employment.  Id. at ¶¶ 17, 19.

In early 2012, Loehr completed Plaintiff's 2011 performance review and met with

Plaintiff on March 29, 2012 to discuss it. Id. at ¶ 28; Exs. 17, 18 to Loehr Decl. Loehr gave

Plaintiff an overall rating of "2.2 - Low 2 - Needs Some Improvement." Id. at ¶¶ 25, 26, 28; Ex.

17 to Loehr Decl. at 13. This was based on a 2.2 rating in two of five competencies:

communication and initiative. Id. at ¶ 25; Ex. 17 to Loehr Decl. at 8, 11. Although Loehr

assessed Plaintiff at a 2.5, meaning "Fully Contributing," in the competency of "customer focus,"

Loehr stated in the written performance review that while Plaintiff was a "great customer

advocate," Loehr had "learned that it is not best to put her on the front lines on the phones[.]" Ex.

17 to Loehr Decl. at 9. Instead, keeping Plaintiff "focused in other areas of billing" helped

Plaintiff be more successful. Id.

 Loehr reported to Jackie Jarosz, Defendant's Director of Customer Service. Loehr Decl.

at ¶ 2. Jarosz required her area customer service managers, including Loehr, to attend an all-day

"calibration" meeting before finalizing annual performance reviews and presenting them to the

CSRs. Id. at ¶ 27. The purpose of this meeting is to try and calibrate, or standardize,

performance measurements across all the CSRs company-wide. Id. Human resources

representative Lisa Kuemper also attends these meetings. Id. Before the meeting, each manager

summarizes his or her CSRs' performance in a standard spreadsheet which other managers

review during the meeting. Id.; Ex. 18 to Loehr Decl. The meeting for the 2011 performance

reviews occurred on February 17, 2012. Id. at ¶ 27. Jarosz and the other managers "generally

agreed" that Plaintiff was not performing satisfactorily as a CSR and that Loehr's proposed

overall score of 2.2 was appropriate. Id.

 During the meeting Loehr had with Plaintiff on March 29, 2012 to deliver her 2011

performance review, Loehr read through the entire review in detail. Id. at ¶ 28. She specifically

4 - OPINION & ORDER

told Plaintiff that the 2.2 score meant she was not performing satisfactorily and she needed to improve her performance to remain employed with Defendant.  Id.

Kuemper and Loehr spoke by phone on April 19, 2012 to discuss the two CSRs in Loehr's group who had received low 2.2 scores on their 2011 performance reviews.  Id. at ¶ 29.  Loehr expressed her concern that Plaintiff was not going to be able to improve and that a PIP or eventual termination may be necessary.  Id.  In response, Kuemper emailed Loehr the templates and examples for a PIP and encouraged her to draft one for Plaintiff.  Id.; Ex. 21 to Loehr Decl. Plaintiff also spoke to Jarosz who recommended that Loehr place Plaintiff on a PIP soon.  Id. at ¶ 30; Ex. 22 to Loehr Decl.

Loehr did not place Plaintiff on the PIP until August 2012.  Id. at ¶¶ 31, 35, 36.  Loehr explains that she wanted to give Plaintiff additional time to improve.  Id. at ¶ 31.  Primarily, however, she waited because the group was short-staffed and busy in the spring and early summer of 2012.  Id. at ¶ 31.  Her lead CSR, Karrie Page, was on maternity leave.  Id.  Other CSRs were out on shorter absences.  Id.  Quality temporary replacements were hard to find.  Id. Loehr states that the previous two times she had placed an employee on a PIP, the employee quit immediately.  Id.  Even though Plaintiff's productivity was low, Loehr was worried that if Plaintiff responded to being placed on a PIP by quitting, the team would be even more understaffed.  Id.  Thus, despite Plaintiff's failure to have significant improvement in her performance, id. at ¶¶ 32, 33, Loehr waited until the end of August to issue the PIP to Plaintiff.

Loehr spoke with Kuemper about Plaintiff again in August 2012 and on August 22, 2012, Kuemper sent Loehr revised templates and recommendations regarding drafting the PIP.  Id. at ¶ 35; Ex. 35 to Loehr Decl.  Loehr completed her first draft of the PIP on August 23, 2012 and

emailed it to Kuemper and Jarosz that day.  Id.; Ex. 36 to Loehr Decl.  Kuemper responded the

next day, requesting some revisions.  Id.; Ex. 37 to Loehr Decl.  Loehr sent a revised draft to

Kuemper later that day, August 24, 2012.  Id.; Ex. 38 to Loehr Decl.  Kuemper responded the

following week, requesting that the PIP be reformatted according to the templates.  Id.; Ex. 39 to

Loehr Decl.

Loehr met with Plaintiff to present her with the PIP on August 29, 2012.  Id. at ¶ 36.

Loehr read through the PIP with Plaintiff "word-for-word" and reviewed examples of her

unsatisfactory performance and communication.  Id.  Plaintiff was required to take online

communication classes and write summaries and to discuss with Loehr how these classes could

help her in her day-to-day work.  Id.  Loehr explained to Plaintiff that Plaintiff's communication

and performance had to improve or she would be terminated.  About two weeks later, Loehr

briefly checked in with Plaintiff to make sure that she was clear on the PIP requirements.  Id.

Plaintiff had no questions.  Id.

Loehr had three meetings with Plaintiff over the next several weeks to review Plaintiff's

progress on the PIP.  Id. at ¶¶ 37-39 (noting meetings on September 18, 2012, October 2, 2012,

October 9, 2012).  Although Plaintiff completed the online classes and written summaries, Loehr

concluded that Plaintiff's day-to-day work was not improving.  Id. at ¶ 40.  Her communications

to co-workers continued to be confusing and she continued to make too many "basic mistakes"

processing orders and credits.  Id.; see also Ex. 46 to Loehr Decl. (Oct. 10, 2012 email from

Loehr to Kuemper regarding continuing problems with Plaintiff)

Loehr worked with Jarosz and Kuemper to update Plaintiff's PIP with additional

examples of how Plaintiff had failed to improve her performance since being placed on the PIP.

6 - OPINION & ORDER

Id. at ¶ 41; Exs. 47, 48 to Loehr Decl.  Subsequent emails to Kuemper from Loehr noted

continued problems with Plaintiff's performance.  Id.; Exs. 49, 50 to Loehr Decl.

Jarosz and Kuemper agreed with Loehr's assessment that Plaintiff was continuing to

perform poorly and that she was not meeting the requirements of the PIP.  Id. at ¶ 42.   On

October 26, 2012, Kuemper told Loehr that Plaintiff's termination was approved.  Id.; Ex. 51 to

Loehr Decl.  Loehr terminated Plaintiff on October 30, 2012.  Id.  Loehr did not hire a

replacement for Plaintiff.  Id. at ¶ 43.  The credit and billing processing functions Plaintiff

primarily performed were absorbed by CSRs in another part of the company.  Id.

On August 21, 2012, several days before Loehr formally placed Plaintiff on the PIP,

Plaintiff complained about Jennifer Chiddix, a co-worker.[3]  Id. at ¶ 46; Pl.'s Ex. 8.  Chiddix

complained to Loehr about Plaintiff that same day.  Id.; Ex. 52 to Loehr Decl.  According to

Loehr, Chiddix and Plaintiff had argued about a credit that Plaintiff processed incorrectly.  Id.

Plaintiff complained that Chiddix was rude and snapped at others.  Pl.'s Ex. 8.  Chiddix

complained that Plaintiff was rude and defensive.  Ex. 52 to Loehr Decl.  Loehr immediately met

with both employees.  Id.  While she believed both employees were to blame for "how the blow-

up developed," she also felt that Plaintiff was "more at fault" because Chiddix was correct that

Plaintiff had made another mistake in processing a credit.  Id.  The meeting ended with both

employees stating that they would try to work through their issues and avoid similar arguments in

the future.  Id.

On the same day, August 21, 2012, another CSR reported to Loehr that CSR Olivia

Bowman had "gone too far" in "bantering" with a co-worker from the warehouse, Tareak Dahini,

---

[3]  Plaintiff had previously complained about Chiddix being rude.  Pl.'s Ex. 7.

by jokingly calling him a "mixed breed." Id. at ¶ 47.  Loehr learned that it was a joke and that

Dahini had laughed.  Id.  Nonetheless, she found it inappropriate.  Id.  She talked to Bowman

immediately.  Id.  Bowman told Loehr that she herself knew it was inappropriate and had already

apologized.  Id.  She reported to Loehr that Dahini was not offended and took it as a joke.  Id.

Loehr cautioned Bowman not to use language like that, even as a joke.  Id.  Loehr then reported

the incident to Dahini's supervisor and spoke to Dahini about it herself.  Id.  Dahini confirmed to

Loehr that he understood the comment as a joke and was not offended.  Id.  She told him that it

was inappropriate language for the workplace.  Id.  Loehr concluded that there was no hostile

intent by Bowman, that Dahini did not take offense, and that it was an isolated incident in which

Bowman had made a joke in poor taste.  Id.

Several days later, on Friday, August 24, 2012 at about 5:24 p.m., Plaintiff emailed Loehr

her weekly status report, as required of all of Loehr's CSRs.  Id. at ¶ 48; Pl.'s Ex. 10.[4]  There,

Plaintiff told Loehr about the "mixed breed" comment.  Id.  Plaintiff wrote:

> On Tuesday, 8/21/2012, Olivia yelled and called Tareak a mixed breed to which
> Tareak said "that is offensive and derogatory." It was.  It makes me cringe to
> work in a hostile environment like this because it doesn't need to be.  It was done
> jokingly and I am not saying we can't have fun, but I just think we need to practice
> a little discretion and tact after all the company took the time to develop and
> establish what is deemed appropriate behavior. . . . .
>
> We have people here who run to you on comments which are non-malicious and
> innocuous.  By the time it gets to you, its [sic] blown out of context, but we don't

---

[4]  The copy of the email in Plaintiff's Exhibit 10 shows that the email was sent on August
25, 2012 at 12:24 a.m.  Defendant explains that many of the emails display the date and time in
Greenwich Mean Time (GMT) despite that most of the emails were sent to and from employees
in Oregon.  Gibson Decl. at ¶ 6.  The actual times are several hours earlier.  Id.  Exhibit 5 to
Gibson's Declaration is a chart of the affected emails and the correct time and date.  Plaintiff's
email of her weekly report bears Bates number LOL001703 and is shown on the chart as having
been sent to Loehr on August 24, 2012 at 5:24 p.m.  Ex. 5 to Gibson Decl. at 15.

have people adult enough to bring something like this to your attention.  Weird!

Pl.'s Ex. 10 at 2.

In response, Loehr sent Plaintiff an email the next day expressing confusion because on the one hand, Plaintiff stated that she knew the comment was made jokingly yet on the other, she called it a hostile environment.  Pl.'s Ex. 11.  Loehr also questioned whether Plaintiff, who referred to people coming to Loehr with comments that are blown out of proportion, was herself blowing this out of proportion when she knew that the comment was made jest.  Id.  Regardless, Loehr acknowledged that the comment was inappropriate.  Id.

STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial."  Fed. Trade Comm'n v. Stefanchik, 559 F.3d 924, 927-28 (9th Cir. 2009) (internal quotation marks omitted).  The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial.  Bias v. Moynihan, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing Celotex, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material.  Suever v. Connell, 579 F.3d 1047, 1056 (9th Cir. 2009).  The court draws inferences from the facts in the light most favorable to the nonmoving party.  Earl v. Nielsen Media Research, Inc., 658 F.3d 1108, 1112 (9th Cir. 2011).

If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## DISCUSSION

Plaintiff brings retaliation claims under both Title VII and Oregon's analogous statute.  42 U.S.C. § 2000e-3(a); Or. Rev. Stat. § (O.R.S.) 659A.030.  Because the federal and state retaliation claims share the same analysis, Payne v. Apollo Coll. - Portland, Inc., 327 F. Supp. 2d 1237, 1245 (D. Or. 2004), they are discussed together.

The order and allocation of proof for disparate treatment cases under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), also governs actions for retaliatory discharge under Title VII.  McGinest v. GTE Servs. Corp., 360 F.3d 1103, 1124 (9th Cir. 2004).  If the plaintiff establishes a prima facie case, the burden shifts as in a disparate treatment case.  Stegall v. Citadel Broad. Co., 350 F.3d 1061, 1066 (9th Cir. 2003).  At that point, the burden is on the employer to articulate a legitimate, non-discriminatory reason for its action.  Id.  If the employer meets this burden, the plaintiff must then show that the articulated reason is pretextual.  Id.

I.  Prima Facie Case

To establish a prima facie case of retaliation, Plaintiff must show (1) that she engaged in

10 - OPINION & ORDER

protected activity; (2) she was subjected to an adverse employment action; and (3) the employer's

action is causally related to her protected activity.  Stegall, 350 F.3d at 1065-66.

    A.  Protected Activity

    Plaintiff's briefing does not make clear whether she relies only on her August 24, 2012

report to Loehr about the "mixed breed" comment as the protected conduct at issue or if she also

relies on her complaints about Chiddix.  To the extent she relies on the complaints about

Chiddix, they do not support a retaliation claim.  Generally, making a complaint, formally or

informally, to a supervisor about allegedly discriminatory policies or practices can constitute

"protected activity" giving rise to an inference of retaliation.  Passantino v. Johnson & Johnson

Consumer Prods., Inc., 212 F.3d 493, 506 (9th Cir. 2000).  But, complaints about a co-worker's

rudeness are not complaints of allegedly discriminatory practices.  The Supreme Court has

cautioned that anti-discrimination statutes are not intended to be a "general civility code"

regulating "the ordinary tribulations of the workplace[.]"  Faragher v. City of Boca Raton, 524

U.S. 775, 788 (1988) (internal quotation marks omitted).

    As several courts have recognized, complaints that do not mention or suggest

discrimination are not protected activity.  E.g., Jamal v. Wilshire Mgmt. Leasing Corp., 320 F.

Supp. 2d 1060, 1079 (D. Or. 2004) (complaints that a supervisor was a "bad manager" but did

not mention or suggest discrimination not protected activity); Fitzpatrick v. Farmers Ins. Exch.,

No. 03:11-cv-00553-KI, 2012 WL 6584980, at *4 (D. Or. Dec. 17, 2012) (complaints only about

unfair treatment insufficient).  Complaints about rudeness or other alleged violations of an

internal company conduct code do not suffice.  E.g., Hervey v. Cnty. of Koochiching, 527 F.3d

711, 722-23 (8th Cir. 2008) (complaints about rude or angry comments that were inconsistent

11 - OPINION & ORDER

with the respectful workplace policy not protected activity).

Plaintiff's complaints about Chiddix make no mention of discrimination. No reasonable juror could understand her complaints to suggest anything other than that Plaintiff believed Chiddix to be rude and unprofessional and did not like Chiddix "snapping" at Plaintiff. The complaints about Chiddix are not protected activity.

As to the report of the "mixed breed" comment, Plaintiff acknowledges that at the time, she recognized that it was meant as a joke. But, she argues that "the comment exacerbated an already active environment where co-workers would yell over cubicles and use inappropriate language." Pl.'s Mem. at 8. Her report to Loehr, however, makes no mention of any other discriminatory conduct and instead refers to the use of "curse words" and "yelling over the cube." Pl.'s Ex. 10.

Defendant argues that given Plaintiff's own acknowledgment that the "mixed breed" comment was a joke, the undisputed fact that Loehr agreed the comment was inappropriate and had already addressed it before receiving Plaintiff's report about it, and that Plaintiff's report made no mention of any other discriminatory conduct, Plaintiff's report to Loehr on August 24, 2012 is not protected conduct. I agree with Defendant.

In a 2001 case, the Supreme Court considered whether an employee's complaint about a single incident constituted protected conduct in support of a Title VII retaliation claim. Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268 (2001). The plaintiff, her male supervisor, and another male employee were reviewing job applications. One application contained a sexually explicit comment which the plaintiff's supervisor read aloud and then stated he did not understand the meaning. The other male employee said "I'll tell you later" and both men chuckled. Id. at 269.

12 - OPINION & ORDER

The plaintiff later complained about the comments and asserted that she was punished for her complaint.  Id.

      The Supreme Court noted that Ninth Circuit law protects employees not only for opposing practices that are actually made unlawful by Title VII but also for opposing practices that the employee could reasonably believe are unlawful.  Id. at 270.  Applying that Ninth Circuit law, the Court held that no one could reasonably believe that the incident violated Title VII.  Id. at 270.  The Court explained that Title VII's anti-harassment provision prohibits conduct only when it is "so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment" and that workplace conduct "must be judged by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Id. at 270-71 (internal quotation marks and brackets omitted).  The Court repeated that "a recurring point in our opinions" that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  Id. at 271 (internal quotation marks and brackets omitted).

      In Breeden, the Court held that no reasonable person could have concluded that the single incident the Plaintiff complained of violated Title VII's standard.  Id. at 271.  The supervisor's comment that he did not know what the statement meant, her co-worker's responding statement, and the chuckling of both men, "are at worst an isolated incident that cannot remotely be considered 'extremely serious' as our cases require."  Id. (internal quotation marks omitted).  As a result, the plaintiff's complaint about this incident was not protected conduct sufficient to support

her Title VII retaliation claim.

Breeden and the cases following it control the outcome here. Like in Breeden, it was unreasonable for a plaintiff to believe that a single, individual act consisting of mocking the physically challenged constituted actionable discrimination. Bentzien v. City & Cnty. of Honolulu, 334 F. App'x 817, 818 (9th Cir. 2009).[5] Thus, the plaintiff's complaint about the action could not support a retaliation claim. Id. Similarly, in Davidson v. Korman, 532 F. App'x 720 (9th Cir. 2013), the court held that no reasonable person would consider two racially-tinged remarks by the plaintiff's co-worker as "an unlawful employment practice of an employer" rather than "an act of discrimination by a private individual." Id. at 722. "Moreover," the court explained, "no reasonable person would consider [the co-worker's] isolated and offhand comments as working a discriminatory change in the terms and conditions of [the plaintiff's] employment." Id. (internal quotation marks omitted). In the same case, the court further held no reasonable person would consider a single sexually explicit remark by the plaintiff's supervisor "as rising to the level of creating a sexually hostile work environment." Id. Thus, the plaintiff could not establish that she engaged in protected conduct. Id.; see also Brannum v. Mo. Dep't of Corr., 518 F.3d 542, 548-49 (8th Cir. 2008) ("single, relatively tame comment" insufficient as a matter of law to support an objectively reasonable belief that it amounted to unlawful harassment).

In this case, the alleged protected conduct is a single remark by Bowman, a co-worker, undisputably in jest, that another co-worker, not Plaintiff, was a "mixed breed." Without more,

---

[5] The Court may cite to unpublished Ninth Circuit opinions issued on or after January 1, 2007. See U.S. Ct. App. 9th Cir. Rule 36-3(b) and Fed. R. App. P. 32.1(a).

the single, isolated remark by Bowman "is insufficient as a matter of law to support an objectively reasonable belief" of the employer's unlawful harassment based on race. Plaintiff fails to establish that she engaged in protected activity.

B. Causal Connection

Even if Plaintiff had engaged in protected activity, and assuming that placing Plaintiff on the PIP was an adverse employment action[6], Plaintiff still fails to establish a prima facie case of retaliation because she cannot establish the requisite causal connection between the protected conduct and Loehr's placing her on the PIP.

Plaintiffs asserting retaliation claims until Title VII must show that the retaliatory motive was the "but for" reason for the unlawful employment action. Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation").

Plaintiff primarily relies on the temporal proximity between her August 24, 2012 report to Loehr about the "mixed breed" comment and Loehr's August 29, 2012 placement of Plaintiff on the PIP to establish the causal connection between the two events. To support an inference of retaliatory motive, the "temporal proximity must be 'very close.'" Breeden, 532 U.S. at 273-74 (citing cases for the proposition that time periods of three or four months are insufficient to raise an inference of causation); see also Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1065 (9th

---

[6] In her First Amended Complaint, Plaintiff alleges that placement on the PIP and termination occurred because she engaged in protected activity. First Am. Compl. at ¶ 34. In her response to the summary judgment motion, she focuses on the placement on the PIP as the adverse employment action at issue. Pl.'s Mem. at 2 ("a retaliatory motive was the reason she was placed on a performance improvement plan"); at 6 n. 6 (stating, in support of her prima facie case of retaliation, that Defendant "does not appear to dispute the imposition of a PIP meets the requirements for an adverse employment action").

Cir. 2002) (while timing alone can satisfy the third prima facie factor of causation, "the termination must have occurred fairly soon after the employee's protected expression") (internal quotation marks omitted).

Plaintiff argues that the five days between her alleged protected conduct and the adverse employment action is sufficient. Defendant notes, however, that while Plaintiff was not presented with the PIP until August 29, 2014, Loehr had drafted the PIP before Plaintiff reported her concern about the "mixed breed" comment to Loehr.

The record supports Defendant. On or before August 22, 2012, Loehr spoke with Kuemper about drafting the PIP for Plaintiff. Loehr Decl. at ¶ 35; Ex. 35 to Loehr Decl. (email from Kuemper to Loehr dated August 22, 2012 providing instructions on completing the PIP for Plaintiff and attaching the PIP template and samples). Loehr completed the first draft and mailed it to Kuemper on August 23, 2012, one day before receiving Plaintiff's complaint about the "mixed breed" comment. Id.; Ex. 36 to Loehr Decl. (email from Loehr to Kuemper dated August 23, 2012 regarding "PIP Sanchez 2012.doc - 1st draft" and attaching the draft). Kuemper responded the next morning, August 24, 2012, seeking additional details on a few items. Id.; Ex. 37 to Loehr Decl.

Loehr sent a final draft to Kuemper late in the day on August 24, 2012, after receiving Plaintiff's complaint. Id.; Ex. 38 to Loehr Decl. (Aug. 24, 2012 email from Loehr to Kuemper sent at 5:37 p.m. with final draft of the PIP).[7] Because Kuemper did not respond to the final draft until August 29, 2012, Loehr did not meet with Plaintiff until that date to place her on the PIP.

---

[7] See Ex. 5 to Gibson Decl. at 15 (showing actual time and date this was sent as August 24, 2012 at 5:37 p.m.).

Id. at ¶¶ 35, 36.

Plaintiff argues that the trigger for Loehr's issuance of the PIP to Plaintiff on August 29, 2012 was obviously her complaint about the "mixed breed" comment because Loehr had failed to issue the PIP to Plaintiff before that date even though she had been contemplating it for months, and the PIP followed so closely on the heels of Plaintiff's complaint. The problem with Plaintiff's argument is that the record undisputably shows that although Loehr had initially thought of placing Plaintiff on the PIP in April 2012, Loehr nonetheless began working on the draft of the PIP two days before receiving Plaintiff's complaint and had completed a draft and sent it to Kuemper for review the day before receiving that complaint. In Breeden, the Court found no causal link between filing a lawsuit and a subsequent transfer when the plaintiff's employer "concededly was contemplating the transfer before it learned of the suit." Breeden, 532 U.S. at 272; see also Barnowe v. Kaiser Found. Health Plan of the Nw., No. CV-03-1672-BR, 2005 WL 1113855, at *5 (D. Or. May 4, 2005) (plaintiff failed to establish prima facie case of retaliation when protected conduct occurred only a few weeks before she was terminated but the record showed she had been asked to resign before she engaged in that conduct). Here, placing Plaintiff on the PIP had been contemplated for several months. And, most importantly, Loehr actively began working on the PIP and had drafted the document before Plaintiff made her complaint about the "mixed breed" comment. The fact that Loehr did not meet with Plaintiff to place her on the PIP until after the complaint was made does not establish causation.

Plaintiff alternatively cites to non-temporal evidence of retaliatory conduct in support of her causation argument. She contends that the "record clearly shows that Loehr never thought Plaintiff was a good employee." Pl.'s Mem. at 15. She notes that Loehr's distrust of her resulted

in Loehr's reliance on other co-workers to train Plaintiff and motivated Loehr's decision to seek early termination of Plaintiff's employment. She also contends that Loehr failed to fully investigate claims of unprofessionalism raised by Plaintiff and took the side of the person about whom Plaintiff complained with little investigation.

These facts fail to suggest that Loehr placed Plaintiff on the PIP because of Plaintiff's complaint about the "mixed breed" incident. In fact, this evidence supports Defendant's argument that Loehr was dissatisfied with Plaintiff's performance long before Plaintiff made her complaint. This in turn undermines any argument by Plaintiff that Loehr was motivated to place Plaintiff on the PIP because of Plaintiff's allegedly protected conduct in late August 2012.

Finally, Plaintiff further argues that the record shows that Plaintiff was the regular subject of jokes and ridicule related to her stature which, she argues, is related to her being Filipino. She contends that it is reasonable to infer that the manner in which Loehr viewed Plaintiff had an impact on Loehr's decisionmaking. As a result, she argues that the facts establish an inference that Loehr's actions were a direct result of Plaintiff's complaint about a racially hostile work environment in August 2012.

Plaintiff's argument is unavailing. Because Plaintiff concedes that her disparate treatment claim cannot withstand Defendant's summary judgment motion, she concedes that she cannot establish that she was treated differently because of her race or create a question of fact on that issue. Because she concedes her hostile environment claim, she concedes that she cannot establish that she was subjected to conduct because of her race that was sufficiently severe or pervasive as to alter the conditions of her employment or create a question of fact on that issue. Construing the facts in Plaintiff's favor, the record, as discussed more fully below, shows that

18 - OPINION & ORDER

Loehr made a single comment to Plaintiff about Filipinos being short. As best Plaintiff can remember, this occurred in the middle of her employment, not close to the time when Loehr placed Plaintiff on the PIP. Given the undisputed evidence that Loehr found Plaintiff's performance unsatisfactory from the start, no reasonable juror could conclude that Loehr's single comment made months before placing Plaintiff on the PIP establishes that Loehr would not have placed Plaintiff on the PIP absent Plaintiff's making the "mixed breed" comment or that Loehr was motivated by Plaintiff's race. Additionally, the causal connection must be between the alleged protected conduct (the report about the mixed breed comment) and placement on the PIP. The undisputed evidence is that Loehr herself found the mixed breed comment inappropriate and had already addressed it before receiving Plaintiff's report. Even if Loehr held some sort of discriminatory animus toward Plaintiff based on her race, that alone does not suggest that the mixed breed comment caused Loehr to place Plaintiff on the PIP.

Because Plaintiff fails to establish that she engaged in protected activity and fails to establish causation, she cannot make out a prima facie case of retaliation. I grant Defendant's summary judgment motion.

## II. Pretext

Alternatively, even if Plaintiff could establish a prima facie case, summary judgment is awarded to Defendant because Plaintiff fails to establish pretext. Under the burden-shifting analysis, once Defendant puts forth legitimate, nondiscriminatory reasons for its action, Plaintiff must show that those legitimate reasons are a pretext for unlawful retaliation.

Plaintiff can prove pretext either "(1) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not

believable, or (2) directly, by showing that unlawful discrimination more likely motivated the

employer." Sanders v. City of Newport, 657 F.3d 772, 777 n.3 (9th Cir. 2011) (internal quotation

marks omitted). A plaintiff can rely on circumstantial evidence to show pretext, but such

evidence must be both specific and substantial. Villiarimo, 281 F.3d at 1062.

In assessing whether the employer's proffered reasons for the action are pretextual, "it is

not important whether they [are] *objectively* false." Id. at 1063. "Rather, courts only require that

an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or

even baseless." Id. (citation and quotation marks omitted).

Plaintiff fails to create an issue of fact regarding her poor performance. She does not

create a factual dispute regarding the numerous incidents recounted by Loehr regarding the

quality of her work and her communication skills. While she notes that she received some

satisfactory scores on her 2011 performance review, she does not dispute that two of the five

specific assessments and her overall score indicated that she needs improvement. Although she

questions whether Loehr's preference for resolving questions within the department was actually

company policy, Plaintiff fails to show that Loehr did not sincerely hold that preference and that

Plaintiff failed to follow Loehr's direction in that regard.

Additionally, Plaintiff is unable to show that similarly situated employees outside of her

protected class were treated differently. Vasquez v. Cnty. of L.A., 349 F.3d 634, 641 (9th Cir.

2003) ("A showing that the [employer] treated similarly situated employees outside [employee's]

class more favorable would be probative of pretext."). Although she names one other employee

who also received a 2.2 low rating, she offers no evidence to suggest that they were similarly

situated with a long history of performance and communication problems.

20 - OPINION & ORDER

Plaintiff attempts to create an inference of discrimination by relying on the comments and jokes made about her height. But, the evidence is not substantial and fails to show that Defendant's proffered reason for placing her on the PIP is unbelievable or that Loehr was actually motivated by discrimination. According to Plaintiff, Loehr made a statement, probably during the "middle" period of Plaintiff's employment with Defendant, that Loehr had lived in Hawaii at one point and "knew Filipinos were short." Pl.'s Dep. at 46-48. Although there were other instances in which remarks and jokes were made about Plaintiff's height, this was the only comment made regarding her race.

Plaintiff, however, never complained about the jokes about her height to Loehr or anyone else who worked for Defendant during her employment. Id. at 46. Plaintiff admits that she participated in jokes and banter with her coworkers about her height. Id. at 36-46.

The fact that Loehr told Plaintiff on a single occasion that she knew Filipinos were short because she had once lived in Hawaii does not establish that Defendant's legitimate, nondiscriminatory reason for placing Plaintiff on the PIP is unworthy of belief. It also does not establish that Loehr had a discriminatory motive. By virtue of conceding her hostile environment claim, Plaintiff concedes that the height-related comments and jokes were not sufficiently severe to create a hostile environment based on her race. Thus, she cannot now argue that this hostile environment is evidence of pretext. Additionally, the fact that Loehr both hired Plaintiff and placed her on the PIP creates a strong inference against discriminatory bias. Coghlan v. Am. Seafoods Co., 413 F.3d 1090, 1096-97 (9th Cir. 2005) (where the "same actor" is responsible for both the hiring and firing of a discrimination plaintiff, a strong inference arises that there was no discriminatory action). A single comment by Loehr that mentioned Plaintiff's race is not

21 - OPINION & ORDER

"substantial" evidence of pretext given that Loehr hired Plaintiff in the first place.

Therefore, even if Plaintiff successfully established a prima facie case of retaliation, her claim still fails. Summary judgment is granted to Defendant on Plaintiff's retaliation claim.

CONCLUSION

Defendant's summary judgment motion [35] is granted.

IT IS SO ORDERED.

Dated this ___13___ day of ___February___, 2015

_____
Marco A. Hernandez
United States District Judge

22 - OPINION & ORDER